**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| PLAINVILLE ELECTRICAL<br>PRODUCTS COMPANY, INC.,<br>　　　　Plaintiff,<br><br>　　　　v.<br><br>BECHTEL BETTIS, INC.,<br>　　　　Defendant. | CIVIL ACTION NO.<br>3:06cv920 (SRU) |

<u>**RULING ON MOTION FOR SUMMARY JUDGMENT & MOTION TO STRIKE**</u>

　　　　This case arises out of a disputed government procurement bidding process.  Plaintiff

Plainville Electrical Products Company, Inc. ("PEPCO") contends that defendant Bechtel Bettis,

Inc. ("Bettis") violated both its 2003 subcontract and an implied contract arising out of the

procurement process during a 2006 competitive bid process.  The Fifth Amended Complaint

alleges eights counts:  breach of contract, breach of implied contract, promissory estoppel,

fraudulent misrepresentation, negligent misrepresentation, violation of the Connecticut Unfair

Trade Practices Act ("CUTPA"), violation of the Connecticut Uniform Trade Secrets Act

("CUTSA"), and unjust enrichment.  Bettis has moved for summary judgment on all counts.

Bettis also moves to strike some of the evidence submitted by PEPCO in opposition to summary

judgment and to strike several portions of PEPCO's Local Rule 56(a)(2) statement.  For the

reasons that follow, Bettis's motion for summary judgment is GRANTED and the motion to

strike is GRANTED with respect to those portions relevant to the issues presented by the motion

for summary judgment.  The remainder of the motion to strike is denied as moot.

**I.　　Factual Background**

　　　　The following facts are undisputed unless otherwise noted.  Bettis operates a nuclear

propulsion laboratory for the United States Navy and the United States Department of Energy in

West Mifflin, Pennsylvania.  Bettis builds and supplies facilities that the government uses to train its personnel.  PEPCO is a Bettis subcontractor that supplied some of the "Type I" Interactive Display Equipment ("IDE") that Bettis uses at its West Mifflin facility to simulate installed shipboard equipment used in training exercises.  In 2002, Bettis held a competitive procurement to award a subcontract under its prime contract with the Navy, which PEPCO won.  Under the resulting subcontract, signed in January 2003 (hereinafter, the "2003 subcontract"), PEPCO supplied Bettis with three Type I IDEs.

The parties do not dispute the 2003 subcontract's written provisions.  The 2003 subcontract's General Provisions incorporate by reference the form contract clause, "Rights in Technical Data – Noncommercial Items," found in the Defense Federal Acquisition Regulations ("DFARS") at 48 C.F.R. § 252.227-7013.  Ex. 2 at B002443.  Pursuant to that DFARS provision, and as incorporated into the 2003 subcontract, PEPCO granted Bettis "unlimited rights in technical data that are . . . (i) [d]ata pertaining to an item, component, or process which has been or will be developed exclusively with government funds."  48 C.F.R. § 252.227-7013(b)(1)(i). For purposes of that clause, "unlimited rights" is defined as "rights to use, modify, reproduce, perform, display, release, or disclose technical data in whole or in part, in any manner, and for any purpose whatsoever, and to have or authorize others to do so."  *Id.* § 252.227-7013(a)(15). All the Type I technical data that PEPCO produced under the 2003 subcontract were developed exclusively with funds that Bettis received from the Navy through its prime contract.[1]  PEPCO

---

[1] PEPCO attempts to deny this fact using a statement made by PEPCO Vice-President Jospeh Nalley in his declaration submitted with PEPCO's opposition to summary judgment, in which he declares that "PEPCO was not paid for the time and expense of qualifying vendors to be utilized in the performance of the 2003 Subcontract."  Ex. 215 ¶ 4.  Bettis has moved to strike paragraph 4 on the ground that it directly contradicts Nalley's prior sworn deposition testimony in

does not dispute that Bettis paid PEPCO all amounts owed under the 2003 subcontract.

Furthermore, that DFARS provision requires that the subcontractor "shall not deliver any data with restrictive markings unless the data are listed on the Attachment." 48 C.F.R. § 252.227-7013(e)(2). The parties here chose not to exercise the opt-out right in the DFARS provision that permits the parties to choose specific items that may retain their proprietary/restrictive markings.

The 2003 subcontract contained an integration clause that expressly states "there are no informal commitments by Bettis that in any way affect the work under this order" and that PEPCO "therefore understands and agrees that this order states the complete agreement of the parties." Ex. 2 at B002448.

Finally, the 2003 subcontract's technical specifications state that "[a]ll drawings and other documentation shall become the property of [Bettis] and can be used by [Bettis] as deemed necessary." Ex. 2 at B002456. The parties dispute the meaning of the language "as deemed necessary," discussed in more detail below.

In late 2004, Bettis engineers informed PEPCO that the government had plans for a "Type II" IDE. Pantloni Dep., Ex. 204 at 81-84. The parties do not dispute that Bettis's engineers would have preferred to give PEPCO the Type II work. Indeed, the Bettis engineers drafted a "single source justification" in an attempt to convince the relevant Bettis procurement personnel that the Type II work should be awarded to PEPCO without a competitive bid. The parties do

_____

which he agreed that all drawings and documentation, including Type I technical data, prepared by PEPCO pursuant to the 2003 subcontract were generated exclusively with government funds. Ex. 202 at 23. Because Nalley's declaration contradicts his prior sworn testimony on this issue, Bettis's motion to strike this paragraph is GRANTED.

dispute whether the Bettis engineers had the requisite authority to bind Bettis for any of the promises that the Bettis engineers may have made regarding PEPCO and the Type II subcontract.

Bettis subsequently held a competitive procurement in 2006 to purchase Type II IDEs and additional Type I IDEs.  Bettis invited PEPCO and its competitor, L-3 AMI Instruments ("AMI"), to participate in the competitive procurement.  In the course of that procurement, Bettis distributed the PEPCO-generated Type I drawings and other data to AMI.  The parties dispute whether Bettis was permitted to do so.

All of Bettis's statements regarding how Bettis would conduct the 2006 procurement were contained in written documents – specifically, the Bettis Inquiry and Request for Proposals, the Bettis Request for Optimal Proposals, and amendments and bulletins thereto (collectively, the "2006 procurement documents").  Exs. 34-38, 41-42.  It is not disputed that the 2006 procurement documents were merely an invitation to bid, and do not contain a promise to contract with PEPCO.

The relevant 2006 procurement document expressly states that "Bettis reserves the right to accept or reject any and all proposals according to its best interests," and that "Bettis' decision regarding award of an order will be made to ensure the Government is provided the best total value." Ex. 35 at 3-4.  The document further states that "[t]his inquiry does not commit Bettis or the Government to pay any costs incurred in the submission of any proposal or in making necessary studies or designs for the preparation thereof or to acquire or contract for any services." *Id.* at 5.

After the deadline to submit its bid had expired, PEPCO submitted an amended proposal, cutting its original bid by $360,000.  Ex. 44.  Bettis concluded that the clarified proposal was a

"late modification," which was "not acceptable" pursuant to the 2006 procurement documents.

Ex. 25 at B00125.  The government contracting officer with authority over Bettis's procurement

decisions subsequently approved that conclusion.  *Id.* at B00125; Ex. 201 ¶¶ 20-21.  Bettis

ultimately concluded that the AMI proposal was in Bettis's best interests and presented the best

value for the government, the two stated criteria in the 2006 procurement documents, and

selected AMI rather than PEPCO to be its IDE subcontractor.

## II.    Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256

(1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion

for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the

light most favorable to the nonmoving party and must resolve all ambiguities and draw all

reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523

(2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of

the nonmoving party"), *cert. denied*, 506 U.S. 965 (1992).  When a motion for summary

judgment is properly supported by documentary and testimonial evidence, however, the

nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather

must present significant probative evidence to establish a genuine issue of material fact.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991), *cert. denied*, 502 U.S. 849 (1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

**III.      Discussion**

PEPCO maintains that Bettis engineers exercised apparent authority and developed a course of performance by which Bettis engineers could make contractual amendments that were subject to merely "perfunctory" review by Bettis's procurement personnel.  When those engineers informed PEPCO of the need for Type II IDEs, PEPCO contends that it undertook "substantial steps" towards the manufacture of Type II IDEs in reasonable reliance on those engineers' representations.  PEPCO also contends that Bettis misused its Type I data, developed pursuant to the 2003 subcontract, by distributing it as part of the 2006 procurement process.

Bettis has moved for summary judgment on all counts on the ground that: (1) the 2003 subcontract gave it an unlimited right to use and distribute the PEPCO-generated Type I data, including the right to disclose that data in the course of the 2006 procurement; (2) there was no written promise to give PEPCO the Type II contract or additional Type I work, nor was there any explicit or implied agreement to conduct the 2006 procurement process in a particular manner; (3) the Bettis engineers lacked any authority to bind Bettis, which PEPCO executives knew; and (4) PEPCO has not put forth any evidence that Bettis engineers intended to mislead PEPCO.

A.      Count One: Breach of Contract

In count one, PEPCO alleges that Bettis breached the terms of its 2003 subcontract by: (1) improperly providing AMI with PEPCO-generated Type I data during the 2006 procurement; (2) improperly identifying PEPCO as the creator of the Type I data to the other 2006 bidders;  (3) improperly directing PEPCO to remove all proprietary markings from the Type I product and improperly conditioning the award of the 2003 subcontract on that requirement; and (4) failing to enter into a contract for Type II work.  In its complaint, PEPCO additionally alleges that Bettis

7

failed to pay PEPCO for Type II preparatory work, improperly used PEPCO's estimates in the 2006 procurement process, and failed to comply with standard engineering communications by supplying AMI with detailed information generated by PEPCO during the competitive bid process.

Bettis contends it is entitled to summary judgment on count one because the 2003 subcontract unambiguously gives Bettis unlimited rights to use and distribute the PEPCO-generated Type I data; therefore, Bettis could distribute the data to AMI and identify PEPCO as the creator of the Type I technical data without breaching the 2003 subcontract.  Bettis further argues that the contract required PEPCO to remove the proprietary markings from its Type I technical data supplied under the contract and that it was not improper to condition the award of the 2003 subcontract on that requirement.  Bettis finally contends there was no enforceable agreement to enter into a contract for additional Type I or Type II IDEs.

PEPCO objects to summary judgment on the ground that Bettis did not have the right to use the PEPCO-generated Type I technical data for any purpose whatsoever, contending that there is a genuine issue of material fact whether there was a subsequent amendment to the 2003 subcontract that limited Bettis's use of the PEPCO-generated Type I data.  PEPCO further argues that Bettis breached the 2003 subcontract by identifying PEPCO as the creator of the Type I data and that the Bettis engineers had the apparent authority to bind Bettis to an agreement to award PEPCO the Type II work.

1.    *Bettis's distribution of the PEPCO-generated Type I technical data during the 2006 procurement*

According to PEPCO, by distributing the Type I data to AMI during the 2006

procurement, Bettis breached its agreement, contained within the 2003 subcontract, that PEPCO would maintain its rights to the Type I data until it no longer became a viable supplier. Specifically, PEPCO contends that the "as deemed necessary" language in the 2003 Technical Specifications section was orally modified to mean that Bettis would obtain the rights to use the PEPCO-generated Type I drawings and other documentation solely to obtain spare or replacement parts for Type I IDEs only in the event PEPCO was no longer a viable supplier. PEPCO contends that "as deemed necessary" is susceptible to multiple reasonable interpretations of the phrase and therefore, it should be permitted to present evidence to the fact-finder on the provision's meaning.  Bettis contends there is no ambiguity in the contractual language and that, under its plain meaning, Bettis had unlimited rights to use, disclose, and distribute the Type I data generated by PEPCO pursuant to the 2003 subcontract.

Because PEPCO seeks to introduce extrinsic evidence of an oral modification to a written contract, PEPCO must first demonstrate that the 2003 subcontract's contractual language is ambiguous.[2]  Where there is no ambiguity in a contract's language, courts must interpret a contract's terms according to their plain meaning; introducing extrinsic evidence is not permissible.  *Levine v. Massey*, 232 Conn. 272, 278 (1995).  Furthermore, where the contract's language is "definitive," determining "what the parties intended by their contractual commitments is a question of law."  *Id.* at 277-78 (internal quotation omitted).  A contract should be "interpreted according to the intent expressed in its language," and where that intent is "clear

---

[2] At the motion hearing, PEPCO argued that the meaning it wished to subscribe to the term "as deemed necessary" was a mere "clarification" of the contract and not an oral modification or amendment of the 2003 subcontract.  However, because PEPCO's interpretation of the provision would restrict Bettis's rights in a way that is not apparent on the face of the contract, it is properly deemed a modification or amendment of the contract.

and unambiguous, there is no room for construction." *Id.* at 278 (internal quotation omitted).  It is not proper to "torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity" because "a party is entitled to rely upon its written contract as the final integration of its rights and duties." *Id.* at 279 (internal quotation omitted).  Significantly, "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Id.* (internal quotation omitted).

Questions of contractual interpretation must begin with a contract's "actual words." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 499-500 (2000). In this case, the Bettis-PEPCO 2003 subcontract incorporated the standard DFARS terms, including that Bettis was to have "unlimited rights in technical data that are . . . (i) [d]ata pertaining to an item, component, or process which has been or will be developed exclusively with government funds." 48 C.F.R. § 252.227-7013(b)(1)(i); Ex. 2 at B002443.  Unlimited rights is further defined as, "rights to use, modify, reproduce, perform, display, release, or disclose technical data in whole or in part, in any manner, and for any purpose whatsoever, and to have or authorize others to do so." 48 C.F.R. § 252.227-7013(a)(15).  Section 8.5 of the 2003 subcontract's Technical Specifications states that "[a]ll drawings and other documentation shall become the property of [Bettis] and can be used by [Bettis] as deemed necessary." Ex. 2 at B002456.

Additionally, the 2003 subcontract contains an integration clause that states that the subcontract is the "complete agreement of the parties," which precludes the introduction of extrinsic evidence to vary or contradict the subcontract's plain meaning. *Tallmadge Bros.*, 252 Conn. at 503.

Those provisions unambiguously convey that Bettis had unlimited rights to the PEPCO-generated Type I technical data that it distributed during the 2006 procurement process. The only reasonable interpretation of the contract's provisions is that Bettis had unlimited rights to all the Type I technical data, meaning it could use, modify, reproduce, perform, display, release or disclose the technical data in whole or in part, in any manner, and for any purpose whatsoever. The Technical Specifications language unambiguously makes all the Type I documents and drawings Bettis's property and gave Bettis the complete discretion to use them as it wanted, i.e., as deemed necessary. Therefore, any claim arising out of Bettis's alleged misuse of PEPCO-generated technical data supplied under the 2003 subcontract must fail as a matter of law – the 2003 subcontract unambiguously gave Bettis the right to use and distribute the data to whomever it wanted and however it wanted, PEPCO's subsequent objections notwithstanding. Consequently, Bettis could distribute the technical data to AMI without breaching the 2003 subcontract.

Furthermore, even if PEPCO was permitted to introduce extrinsic evidence in support of its claim that the contractual provision was orally modified, its claims would fail on the merits because none of the evidence cited by PEPCO supports its claim. As the basis for its claim that "as deemed necessary" means that Bettis's right to the technical data was limited to a right to distribute only in the event that PEPCO was no longer a viable supplier of Type I IDEs, PEPCO cites PEPCO Vice President Joseph Nalley's deposition testimony, Ex. 216 at 97-99, and his declaration, Ex. 215 ¶ 6. When asked about that specific allegation in the complaint, Nalley explains:

A:     The subject of spare parts of course was being discussed and in this

11

discussion we were told that we were not to provide any proprietary markings because it would impair Bettis and the United States Government, in particular the government, from being able to procure those parts in the event of an inability on PEPCO's part to provide them.  It's just as it states, you know, we were told that we were not to be able to mark those parts as proprietary.  It would be a restriction of the government's ability to procure spares and repairs.

* * *

Q:      Did PEPCO object to that instruction [about removing proprietary markings]?

A:      We reminded them and we discussed the reasons and asked them to restate the reasons.  And in keeping with our relationship with Bettis, [Bettis engineer] Mr. Pantloni actually asked me personally if we would entertain the idea of providing spare parts to them, that they did not want to use the resources or have that responsibility, they would like that to remain with us.  At first we were reluctant because it is a job that there's not much value added to but we felt compelled to do what we could to support that effort rather than to introduce – if we refused, it would put somebody else, a Graybar or a parts house, that would not necessarily understand specifically what was being – what was desired and what was being purchased and might be a price that was on a different – off a different price list than we would have because of a relationship we might have with that particular component supplier.

So the results of that discussion were that we agreed to do it.  And they asked us not to put proprietary markings on it and we like if we refused to do that then they would outsource us and they would put it out in the community and not necessarily get the best service.

Nalley Dep., Ex. 216 at 97-99.  Even interpreting this deposition testimony in the light most favorable to PEPCO, there is nothing in that testimony that suggests Bettis and PEPCO undertook to orally modify the meaning of "as deemed necessary," to limit Bettis's right to distribute the PEPCO-generated drawings and documents only in the event that PEPCO was no longer a viable supplier of Type I IDEs.  Rather, it appears Bettis was explaining why the subcontract requires PEPCO to remove the proprietary markings – because it makes it easier to

obtain spare parts – and that Bettis sought to have PEPCO supply the necessary spare parts.

There is nothing in that testimony that suggests Bettis agreed to limit its right to distribute the

PEPCO-generated technical data only where it could not use PEPCO as a viable supplier of spare

parts.

PEPCO further cites to paragraph 6 of Nalley's Declaration for evidentiary support of an

oral modification.  Bettis has moved to strike paragraph 6 of the declaration because it directly

contradicts Nalley's prior deposition testimony on the subject.  In paragraph 6, Nalley states that

"[t]hroughout PEPCO's performance of the 2003 Subcontract, Bettis clarified Subsection 8.5 of

the Subcontract Technical Specifications by a subsequent agreement with PEPCO that the use of

all drawings and other documentation 'as deemed necessary' shall be limited to the use of

drawings and documentation solely to obtain spare or replacement parts for the Type I only if

PEPCO was no longer a viable supplier of said parts."  Ex. 215 ¶ 6.  In his prior sworn deposition

testimony, however, when asked whether there were ever any amendments to the 2003

subcontract that changed that exact provision, Nalley responded that he was not aware of any

written or oral changes that would modify section 8.5 of the Technical Specifications.[3]  Nalley

---

[3] The deposition transcript reads as follows:

> Q:      It says, "All drawings and other documentation shall become the
> property of the Buyer and can be used by the Buyer as deemed necessary."
>
> A:      Yes.
>
> Q:      Did you understand the Buyer was Bettis?
>
> A:      Yes, I did.
>
> Q:      Were there ever any amendments to this contract that changed that
> provision, to your knowledge?

Dep., Ex. 202 at 22-23.  Because paragraph 6 directly contradicts his prior deposition testimony, the motion to strike that paragraph is granted.  *See Brown-Criscuolo v. Wolfe*, 2007 U.S. Dist. LEXIS 62249, *11 (D. Conn. 2007) (striking portions of affidavit that directly contradicted affiant's prior sworn deposition testimony).

Therefore, because PEPCO's interpretation of the 2003 subcontract is not based on any textual ambiguity, nor can it identify any admissible extrinsic evidence of an oral modification, its claim that Bettis breached the contract by distributing the PEPCO-generated Type I data to AMI during the 2006 procurement must fail.

2.      *Identification of PEPCO as the creator of Type I technical data*

PEPCO further argues under count one that Bettis breached the 2003 subcontract by identifying PEPCO as the creator of the Type I technical data in the materials it distributed during the 2006 procurement because it was not "necessary" to do so.  As discussed above, the

---

A:      No.

* * *

Q:      You are not aware of any written changes, correct?

A:      I'm not aware of any changes that would modify this?

Q:      Yes.

A:      No.

Q:      Are you aware of any other types of changes, oral or any other kind, that would modify this section 8.5 that we talked about?

A:      Not that I'm aware of.  No.

Nalley Dep., Ex. 202 at 22-23.

plain meaning of "as deemed necessary" is that Bettis had complete discretion to use the technical data as it saw fit.  Furthermore, the 2003 subcontract granted Bettis the unlimited right to "reproduce" and "release" the PEPCO technical data "in whole or in part" "for any purpose whatsoever."

PEPCO cannot point to any contractual provision or other evidence that would suggest that identifying PEPCO as the creator of the Type I technical data was a breach of the 2003 subcontract.  Bettis admits that it distributed Type I data during the 2006 procurement that had PEPCO's name on it, but maintains that this would not have informed AMI that it was competing against PEPCO because Bettis did not reveal whether the bid was "single source, sole source, or competed."  Hutchings Dep., Ex. 220 at 193-96.  Even assuming that revealing PEPCO as the creator of the Type I data informed AMI that it was competing against PEPCO in the 2006 procurement, PEPCO has failed to explain how that constitutes a breach of the 2003 subcontract – Bettis had unlimited right to release the data in whole, for any purpose whatsoever, and as it deemed necessary.  Therefore, because Bettis had the authority to distribute the Type I in any manner it saw fit, to the extent that PEPCO's breach of contract claim is founded on the presence of PEPCO's name on the Type I data during the 2006 procurement, something that Bettis had the authority and discretion to reveal, it fails as a matter of law.

> 3. *Validity of the contract provision requiring PEPCO to remove all proprietary markings from the Type I data*

PEPCO further alleges that it was a breach of the 2003 subcontract to require it to remove all the proprietary markings from the Type I technical data it supplied under the contract and that it was improper for Bettis to condition the award of the 2003 subcontract on that requirement.

Because there is an unambiguous contractual provision giving Bettis the right to require PEPCO to remove the proprietary markings from the Type I data, this claim also fails. The DFARS regulations that were incorporated into the terms and conditions of the subcontract clearly state that all restrictive markings must be removed from the data, unless the parties agree otherwise. *See* 48 C.F.R. § 252.227-7013(e)(2). The parties did not have an agreement that any of the Type I data could retain its restrictive markings; therefore, the subcontract permitted Bettis to require PEPCO to remove its proprietary markings. In addition, it was not a breach to condition the award of the 2003 subcontract on acquiring ownership of the Type I data because DFARS provides a mechanism for protecting trade secrets that the parties chose not to use, 48 C.F.R. § 252.227-7013(e)(2)-(3), and there is nothing in the language of the subcontract or course of performance to suggest that it was an unfair contractual condition. Furthermore, PEPCO has not cited any case law interpreting that provision to be unfair as a matter of law.

4.     *Failure to award contract for Type II work*

Finally, under count one, PEPCO also seeks damages for Bettis's failure to enter into a contract for the Type II IDE and/or its failure to compensate PEPCO for the Type II work it undertook in reliance on statements by Bettis engineers that PEPCO would receive the Type II work. PEPCO contends that, through a course of performance that clothed the Bettis engineers with apparent authority to undertake contractual amendments, those statements created an enforceable contract regarding PEPCO's Type II preparatory work ahead of the 2006 procurement bidding process. Bettis seeks summary judgment on this claim on the grounds that: (1) there is no evidence of an oral amendment or new contract; (2) even if an oral amendment to the 2003 subcontract relating to Type II work existed, it is not enforceable because those engineers lacked

the authority to bind Bettis; and (3) alternatively, Bettis contends that any contract is unenforceable, as lacking material terms or as in violation of the statute of frauds, or that any agreement was an unenforceable "agreement to agree."

PEPCO does not dispute that the Bettis engineers who promised it more work lacked "actual" authority to commit Bettis to any contract or promise of such work. PEPCO also does not dispute that the 2003 subcontract expressly identifies three Bettis contracts personnel as the only persons with authority to commit Bettis to contracts or contract changes. Ex. 2 at B002438; Ex. 202 at 24-25, 44; Ex. 205 at 59. Nalley testified that he understood that those three people had the sole authority at Bettis to change the subcontract and that he understood that, at the meetings where the Type II work was discussed, no work was actually being awarded because "there was no contractual people there." Ex. 202 at 24-25, 44. In addition, PEPCO President Robert Sposato testified that he was aware that any commitments to contract for additional Type II work by Bettis engineers required approval from Bettis contracts personnel and the U.S. Navy, or as he testified, someone beyond Bettis project manager and engineer Vincent Pantloni. Ex. 208 at 110. Furthermore, it is not in dispute that, at the time the engineers were making their alleged representations regarding additional work, Sposato and PEPCO Director of Engineering Jack Warhola knew that the relevant Bettis personnel had not yet decided to give the Type II work to PEPCO. Ex. 208 at 110, 118-19; Ex. 209 at 71.

PEPCO nevertheless contends that those engineers possessed apparent authority to bind Bettis to a contract or promise of work. Sposato testified that although he knew the Bettis engineers, including Bettis engineer and project manager Vincent Pantloni, did not have final authority to approve amended or new contracts, he believed their proposal to award PEPCO the

17

Type II work was subject to mere "perfunctory approval." Ex. 208 at 119.  PEPCO contends,

therefore, that there is a genuine issue of material fact whether those Bettis engineers had the

requisite apparent authority to bind Bettis to contractual commitments.

"Apparent authority is that semblance of authority which a principal, through his own acts

or inadvertences, causes or allows third persons to believe his agent possesses." *Gordon v.*

*Tobias*, 262 Conn. 844, 850 (2003).  Significantly, apparent authority is determined by the acts of

the principal, not the acts of the agent. *Id.* at 851.  Whether an agent possessed apparent

authority is a question of fact to be determined using two criteria:

> First, it must appear from the principal's conduct that the principal held the
> agent out as possessing sufficient authority to embrace the act in question, or
> knowingly permitted the agent to act as having such authority.  Second, the
> party dealing with the agent must have, acting in good faith, reasonably
> believed, under all the circumstances, that the agent had the necessary
> authority to bind the principal to the agent's action.

*Id.* (internal quotations and alterations omitted).

To survive summary judgment, therefore, PEPCO must first establish an evidentiary basis

from which a reasonable fact-finder could find that Bettis held out its engineers as possessing

sufficient authority to bind the company in a new or amended contract and that PEPCO

reasonably believed that the engineers actually had the necessary authority to bind Bettis.

PEPCO has failed to put forth sufficient evidence on either prong of the apparent authority test.

First, PEPCO has submitted no evidence that Bettis held out its engineers as possessing the

authority to bind the company or knowingly permitted the engineers to act as though they had

such authority.  The language of the contract itself specifically identifies the three Bettis

personnel who possessed the necessary contractual authority, none of whom was a Bettis

engineer.  Nor is there any evidence that anyone at Bettis, including the engineers themselves, represented that the engineers did possess actual authority to bind Bettis.  PEPCO states that there were several instances where decisions by engineers were subject to mere perfunctory review so that Bettis held out its engineers as possessing the requisite authority.  Other than asserting this conclusory allegation, however, PEPCO has not pointed to any examples of such conduct in the record.  At summary judgment, it is not sufficient for PEPCO to assert that such incidents occurred; it must present some evidentiary basis to support that claim.  There is simply no evidence in the record that Bettis did anything to hold out its engineers as having the authority to bind the company contractually.

Second, even if there was evidence that Bettis held out its engineers as possessing the requisite authority, PEPCO must still present a factual basis upon which a reasonable jury could find that PEPCO reasonably believed the engineers had the necessary authority.  The undisputed evidence in the record demonstrates, however, that all the PEPCO executives knew and acknowledged that the Bettis engineers' proposal to give PEPCO additional Type II work required further approval.  For example, PEPCO President Sposato testified that he understood that the Bettis engineers needed to get Bettis and Navy approval to award PEPCO a single-source award for Type II work.[4]  Sposato Dep., Ex. 208 at 109-10.  Although he testified at his

---

[4]  The relevant passage from the deposition reads:

> Q:     Is it your understanding that for Bettis to do a single-source award, that they had to get Bettis contractual approval of that?

> A:     Yes.

> Q:     And Navy approval for that?

19

deposition that Bettis engineer Vincent Pantloni made representations that PEPCO would get the

additional work if they performed well under the 2003 subcontract, Sposato Dep., Ex. 217 at

66-67, Sposato also admitted later in his deposition that he knew that someone other than

Pantloni had to approve any award of the Type II work to PEPCO.[5]  *Id.* at 118-19.  Nalley

---

A:      Yes.

Q:      So the engineers that you were dealing with couldn't single source the work on their own?

A:      It's no different than the paragraph that you called out for me a little bit earlier.  It says, "Commitments here are not binding unless they become contractual."  I understand that.

Q:      So whatever the engineers promised you, you understood that Bettis contracts and the United States Navy had to approve any decision to single source?

A:      Yes.

Sposato Dep., Ex. 208 at 109-10.

[5] The relevant passage from Sposato's deposition reads as follows:

Q:      You understood that Bettis Purchasing had to approve the justification in order for the [Type II] work to be awarded on a single-source basis?

A:      Well, in fact, I'm not aware of who made the decision to go from single source to bid.  I don't know who did that.  I have no idea.

Q:      But when Mr. Pantloni told you that the engineers were preparing a single-source justification, did you understand that Bettis Purchasing had to approve the justification in order for there to be a single-source award to PEPCO?

A:      Normally, that would be a perfunctory approval.

Q:      My question to you is, yes or no . . . when Mr. Pantloni told you that the Bettis engineers were preparing a single-source justification, did you understand that Bettis Purchasing had to approve it in order for there to be a

testified at his deposition that at the meeting where Bettis engineers first disclosed Bettis's desire to have Type II IDE, he knew that no work was being contracted because there were "no contractual people there."  Nalley Dep., Ex. 202 at 44.

In addition, all the minutes from meetings between PEPCO executives and Bettis engineers contain the following disclaimer:

> If the commitments, decisions, or agreements herein are deemed by the prime contractor and/or the subcontractor to involve a change in contract price, the prime contractor and/or the subcontractor agree not to proceed with any of this work until a change notice has been issued.  The prime contractor and/or the subcontractor further understand that if they proceed with any portion of this work without written contractual approval, they do so at their own expense.  *Further, all commitments, decisions, or agreements contained herein are subject to official confirmation by authorized Bettis management*.

Ex. 5 at 2; Ex. 8 at 2; Ex. 10 at 2 (emphasis added).  The minutes from those meetings also reflect that the Bettis engineers explicitly reminded PEPCO that work performed by PEPCO outside the scope of the 2003 subcontract could not be billed to Bettis.  Ex. 6 at ¶ 6.  Furthermore, minutes from a March 2005 meeting specifically state that "[n]o contractual commitment exists at this point for fabrication of type 2 instrumentation IDE."  Ex. 8 at ¶ 1.  Therefore, there is no factual basis upon which a reasonable fact-finder could find that PEPCO

---

single-source award?

A:       In fact, I don't know exactly who had to approve it.  As far as I'm concerned, Santa Claus had to approve it.  I don't know who had to approve it.

Q:       It had to be somebody other than Vincent Pantloni?

A:       Yes.

Sposato Dep., Ex. 208 at 118-19.

reasonably believed Bettis engineers had actual authority to bind Bettis to a new or amended contract.

In the absence of any evidence to support a finding that the Bettis engineers had the apparent authority to bind Bettis to a commitment to award PEPCO the Type II contract, it is not relevant whether or not the Bettis engineers promised or assured PEPCO that it would receive the Type II contract.  Even if the engineers and PEPCO executives actually reached an agreement for future work, if the engineers lacked apparent authority to enter into contractual obligations on behalf of Bettis then those agreements have no binding force.  PEPCO's reliance *MD Drilling & Blasting, Inc. v. MLS Construction, LLC,* 93 Conn. App. 451 (Conn. App. Ct. 2006), does not bolster its case on the issue of apparent authority.  Crucially, the ability of certain employees to make contractual obligations on behalf of their employer was never an issue in *MD Drilling*. PEPCO cannot overcome the lack of evidence to support a finding that the engineers possessed the necessary authority to bind Bettis to any contractual obligations that resulted from those discussions.  Accordingly, the apparent authority claim fails as a matter of law.

      B.    <u>Count Two:  Breach of Implied Contract</u>

In count two, PEPCO alleges that Bettis violated an implied contract to conduct the 2006 procurement pursuant to its own disseminated procedures and protocols – specifically, to act with the utmost honesty and integrity in conducting the procurement – by, *inter alia*, (1) failing to reject AMI's bid as non-conforming; and (2) failing to permit PEPCO the opportunity to correct its bid.   Bettis contends that it is entitled to summary judgment on count two because there is no evidence to support the existence of an implied contract to conduct the 2006 procurement process

in that particular way.[6]

An implied contract "depends on actual agreement, and the party charged must have agreed, either by words or action or conduct, to undertake a contractual commitment to the party seeking to enforce such a commitment." *Rosario v. J.C. Penney*, 463 F. Supp. 2d 228, 231 (D. Conn. 2006). Like an express contract, an implied contract "requires a 'meeting of the minds' between the parties." *Id.*

The fundamental question is whether there was a binding obligation to conduct the procurement process in a particular manner and whether Bettis in fact breached that obligation. PEPCO does not dispute that Bettis could establish procedures and protocol for the 2006 bidding process as it saw fit; it contends, however, that once those procedures and protocol were established, PEPCO had a right to treat them as contractual rights. The threshold problem for PEPCO is establishing that Bettis incorporated the obligation that the 2006 procurement would be conducted with the utmost honesty and integrity into its 2006 procurement procedures. It is undisputed that all of Bettis's statements regarding how Bettis would conduct the 2006 procurement were contained in the written 2006 procurement documents. Nowhere in the Type II bid request (Ex. 34), inquiry provisions and instructions (Ex. 35), or draft purchase order (Ex. 36), however, is the "utmost honesty and integrity" language used.

PEPCO's only evidentiary source for its claim that Bettis was implicitly contractually obligated to conduct the procurement with the "utmost honesty and integrity" is Bettis

_____

[6] Bettis additionally moves for summary judgment on count two on the ground that there is no evidence that there was an implied contract to award PEPCO any Type II work. That issue is moot, because PEPCO concedes that it is not claiming that the procurement documents formed an implied contract to give it work. *See* PEPCO opposition brief at 24 n.1.

procurement manager Mary Hutchings's deposition testimony, in which she agreed that Bettis is

required to act with the utmost honesty and integrity with respect to its subcontractors.  Ex. 220

at 216.  PEPCO argues that Hutchings's testimony conclusively establishes that Bettis owed the

bidding companies such a duty and it is a question of fact whether Bettis breached that duty.

Even taken in the light most favorable to PEPCO, however, that statement does not establish that

Bettis was contractually bound to conduct the 2006 procurement with the utmost honesty and

integrity.  Her statement refers only to the obligation that Bettis owed its subcontractors.

Hutchings' statement would not permit a reasonable fact-finder to find that Bettis undertook an

enforceable obligation to conduct the *procurement process* with the utmost honesty and integrity.

The procurement document provisions that expressly cover how the procurement would

be conducted give Bettis broad discretion.  For instance, the 2006 procurement document

contains specific disclaimers reserving Bettis's right to accept or reject any bid with or without

prior discussion, and the right to act in its own best interests.  Ex. 35 at 3, §§ 10(c), 10(e).  The

2006 procurement documents also state that Bettis reserved the right to determine which bid

presented the best value.  *Id.* at 4, § 13.

Even taking Hutchings' deposition testimony in the light most favorable to PEPCO, when

analyzed in conjunction with the unambiguous language of the 2006 procurement documents, the

record does not permit a reasonable fact-finder to find that Bettis agreed, either by words or

action or conduct, to undertake a contractual commitment to conduct the 2006 procurement with

the utmost honesty and integrity.   That is, even if Bettis was contractually bound to treat its

subcontractors with the utmost honesty and integrity, there is nothing in the 2006 procurement

documents that extends that obligation to the procurement process.

24

PEPCO additionally argues that, because the draft purchase order for the 2006 procurement stated that the order was "subject to Bettis's Prime Contract with the Navy," which in turn contained an obligation that government contractors must act with the utmost honesty and integrity, Hutchings Dep., Ex. 223 at 254, Bettis was obligated to treat PEPCO with the utmost honesty and integrity as its subcontractor. Bettis argues that the DFARS language containing the "utmost honesty and integrity" language applies to its conduct towards the government, not its conduct towards its subcontractors. *See* 48 C.F.R. § 203.7000. Bettis also argues that, to the extent that the DFARS clause is relevant to Bettis's treatment of its subcontractors, there is no language indicating that it applies with equal force to how Bettis conducts a procurement for subcontractors. PEPCO has not cited any court decisions, any statutes, or any regulations that would support either of its claims, namely, that Bettis was required to treat its subcontractors or conduct its procurements with the utmost honesty and integrity by virtue of that DFARS clause.

Furthermore, even if a reasonable fact-finder could find that Bettis had an implied contractual duty to conduct the 2006 procurement with the utmost honesty and integrity, PEPCO's claims under count two would nevertheless fail as a matter of law because PEPCO has presented no admissible evidence that Bettis breached that obligation. Namely, it is undisputed that Bettis determined that AMI presented the bid that was in Bettis's best interests and presented the best value to the government – the only stated criteria in the 2006 procurement documents. PEPCO alleges a variety of ways in which Bettis did not act with the utmos honesty and integrity; for instance, PEPCO claims that Bettis improperly scored PEPCO's proposal and failed to accept the only conforming bid submitted by the required date. *See* PEPCO List of Disputed Issues of Material Fact ¶¶ 20-37. As the evidentiary basis for these claims, PEPCO relies on its

25

own answers to Bettis's request for interrogatories.  Those answers provide no evidentiary

support for the claims, but instead merely restate the allegations advanced in the complaint.  Ex.

211 at 7.  For that reason, Bettis has moved to strike those disputed facts and PEPCO's denial of

paragraph 74 of Bettis's 56(a)(1) Statement that "PEPCO has no evidence suggesting that Bettis

conducted the 2006 procurement dishonestly or without integrity."  Bettis Local Rule 56(a)(1)

Statement ¶ 74.

A court may only consider admissible evidence when determining a motion for summary

judgment.  *Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69, 75 (D. Conn. 2004).

A motion to strike is the appropriate way of challenging inadmissible evidence at the summary

judgment stage.  *Id.*  When deciding a motion to strike, the court must determine whether the

challenged piece of evidence would be admissible at trial.  *Raskin v. Wyatt Co.*, 125 F.3d 55, 66

(2d Cir. 1997).  A motion to strike is appropriate if documents submitted in opposition to a

motion for summary judgment are based on information that cannot be attributed to personal

knowledge.  *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999).

Federal Rule of Civil Procedure 56(e) requires that testimony submitted in support of, or

in opposition to, summary judgment be based on personal knowledge.  Federal Rule of Evidence

602 states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to

support a finding that the witness has personal knowledge of the matter."

Nalley signed the interrogatory answers, stating that the answers contained therein were

"true to the best of [his] information, knowledge and belief."  That statement is not synonymous

with personal knowledge.  For instance, Nalley could not testify at trial about how Bettis scored

AMI and PEPCO's bids.  Because he was not a Bettis employee involved in those internal

26

discussions, he cannot claim to have any personal knowledge about them.  PEPCO's

interrogatory responses are simply insufficient to create a genuine issue of material fact on the

issue whether Bettis conducted the procurement dishonestly and without integrity.  All the

statements that PEPCO relies on from its interrogatory answers involve conduct by Bettis –

conduct that Nalley cannot have personal knowledge about.  Because those particular

interrogatory responses were not based on Nalley's personal knowledge, Bettis's motion to strike

them and any statements of disputed fact or denials of Bettis's statement of undisputed fact that

rely on those interrogatory answers as the sole evidentiary basis for PEPCO's claim is

GRANTED.

PEPCO has not established a genuine issue of material fact whether there was any

binding obligation on the part of Bettis to conduct the 2006 procurement with the utmost honesty

and integrity, much less any evidence of how Bettis breached any such obligation.  Accordingly,

count two fails as a matter of law.

C.    Count Three: Promissory Estoppel

PEPCO's claims for promissory estoppel arise out of the same claims it makes for breach

of an implied contract in count two, namely that Bettis made misrepresentations with regard to

how it would conduct the 2006 procurement.  PEPCO concedes that the same arguments that

apply to its implied contract claim, apply equally to its promissory estoppel claim.

To be successful on its promissory estoppel claim, PEPCO must demonstrate: (1) a clear

and definite promise; (2) which Bettis should reasonably have expected to induce reliance; (3)

which did induce reliance; and (4) enforcement of which is the only way to avoid injustice.

*D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High Sch.*, 202 Conn. 206, 213 (1986).

27

As with its implied contract claim, PEPCO has failed to present evidence from which the fact-finder could find: first, how Bettis breached the explicit terms of the 2006 procurement documents by selecting AMI's proposal; second, how there was a clear and definite promise to conduct the 2006 procurement with the utmost honesty and integrity; and third, even assuming there was such a promise, how Bettis did not fulfill that promise or how PEPCO reasonably relied on that promise to its detriment.

To the extent that PEPCO seeks damages for its costs in preparing for the Type II bid, the 2006 procurement documents contain an explicit disclaimer that "[t]his inquiry does not commit Bettis or the Government to pay any costs incurred in the submission of any proposal or in making necessary studies or designs for the preparation thereof or to acquire or contract for any services." Ex. 35 at 5. Because that disclaimer extends to all the procurement documents PEPCO cannot show that it was reasonable for it to undertake any projects in reliance on the 2006 procurement process. Accordingly, count three fails as a matter of law.

D.    Count Four:  Fraudulent Misrepresentations

PEPCO's fraud claim is based on the statements, made by the Bettis engineers throughout the performance of the 2003 subcontract, suggesting that PEPCO would receive a contract for the Type II work. Bettis asserts that it is entitled to summary judgment because PEPCO has not asserted any facts in support of several elements necessary to prove fraud. Specifically, Bettis contends that the statements from the Bettis engineers were neither false, nor intended to mislead. Bettis also argues that PEPCO could not have reasonably relied on any Bettis engineer's promise or statement regarding Type II work because PEPCO knew that the engineers' proposals and representations were subject to final review by Bettis contracts personnel.

28

"[T]he essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Leonard v. Commissioner of Revenue Servs.*, 264 Conn. 286, 296 (2003) (internal quotation omitted). An essential ingredient of the false representation element is that the party must have the present intention not to carry out the stated promise. *Duplissie v. Devino*, 96 Conn. App. 673, 681 (Conn. App. Ct. 2006) ("A representation about a promise to do something in the future, when linked with a present intention not to do it, is a false representation.").

PEPCO's fraud claim fails because PEPCO has not presented any evidence that the Bettis engineers made false representations with the intent to induce PEPCO to rely on those statements. At most, PEPCO can show that the Bettis engineers were actively pulling for Bettis to award PEPCO the Type II work, but there is no evidence that would convert those feelings into fraud. Even assuming the Bettis engineers made false statements and that it was reasonable for PEPCO to rely on those false statements, this claim still fails because there is no evidence to permit a reasonable fact-finder to find that the Bettis engineers had the present intention to renege on their promises to PEPCO. Viewing the evidence in the light most favorable to PEPCO, the engineers made what turned out to be false statements but, at the time they made those statements, they sincerely believed they were true. Given the competitive bid process, there is no way that the Bettis engineers could have known that what they were saying was false. Furthermore, PEPCO executives admitted that they knew the engineers did not have the final contracting authority to bind Bettis – at the very least, they knew that any agreement was subject

to some subsequent review and approval from Bettis contracts personnel.  Even if there had not

been a competitive bid process for Type II work, there would have been a second contracting

round.  Therefore, PEPCO cannot now assert that it reasonably relied on the engineers' alleged

promises to undertake any Type II work.  As discussed above, there is no evidence that Bettis

held out their engineers as possessing actual authority, a necessary element to support any claim

that PEPCO reasonably relied on those statements.  Accordingly, count four fails as a matter of

law.

E.    Count Five: Negligent Misrepresentation

PEPCO's negligent misrepresentation claims are similarly based on the statements made

by Bettis engineers that PEPCO would receive Type II work.

To prove negligent misrepresentation, PEPCO must demonstrate that: (1) Bettis made a

misrepresentation of fact, (2) Bettis knew or should have known was false, and (3) PEPCO

reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result.  *Nazami*

*v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006).

PEPCO need not show that the Bettis engineers had an intent to mislead PEPCO to

prevail on this claim.  Nevertheless, the negligent misrepresentation claim fails for the alternative

reasons discussed above:  There is no evidence upon which a reasonable fact-finder could find

that the engineers' promises were misrepresentations of fact that they should have known were

false.  There is evidence that the engineers believed PEPCO would get the Type II work and

encouraged PEPCO to that end.  However, because the engineers did not possess the necessary

authority to transform their statements into statements upon which PEPCO could have

reasonably relied, the claim fails.  The undisputed evidence shows that only a few contracts

personnel had the authority to make changes to existing contracts or enter into new contracts on Bettis's behalf, that PEPCO was aware of the limits of the engineers' authority, that during the meetings when the alleged representations were made it was reiterated that no Type II work was being officially requested, and that the written minutes reflect warnings to that effect.  PEPCO has not presented sufficient evidence from which a reasonable fact-finder could find that Bettis negligently misrepresented its intentions to PEPCO regarding Type II work so that PEPCO was reasonable in undertaking an expensive expansion of their facilities.

Furthermore, any fraud or negligent misrepresentation claim regarding the dissemination of PEPCO-generated Type I data fails for the reasons that count one fails, as described above. Specifically, the contract gave Bettis unlimited rights to use, distribute, or disclose that data to whomever it wished.  Accordingly, count five fails as a matter of law.

F.      Count Six: CUTPA Claim

Bettis advances several reasons why summary judgment is appropriate on PEPCO's CUTPA claim, most pertinently, because Bettis's conduct is not subject to CUTPA, because an officer acting under the authority of the United States permitted it, and because the alleged misconduct did not occur in the course of trade or commerce, as defined by CUTPA.  PEPCO defends its CUTPA claim on the ground that Bettis should not be permitted to cloak its conduct under CUTPA's governmental immunity provision.

CUTPA states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  CUTPA provides a cause of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act

or practice prohibited by section 42-110b." *Id.* § 42-110g(a).  CUTPA provides immunity to conduct permitted by the U.S. government.  Section 42-110c(a)(1) states that "[n]othing in this chapter shall apply to . . . [t]ransactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States. . . ."

Bettis has the burden of proving the governmental immunity exception to CUTPA.  *Id.* § 42-110c(b).  Allegedly unfair or deceptive trade practices do not give rise to a CUTPA claim where the defendant acts in good faith pursuant to a government contract that is based on lawful authority.  *Lawson v. Whitey's Frame Shop*, 241 Conn. 678, 678, 688 (1997).  "Conduct specially approved by the governmental official with supervisory power over the conduct cannot constitute an unfair or deceptive trade practice."  *RW Group, Inc. v. Pharmacare Mgmt. Services, Inc.*, 2006 WL 1320225, at *9 (Conn. Super. Ct. 2006).

It is undisputed that the government contracting officer with supervisory power over Bettis expressly approved Bettis's decision to hold a "best value" competition for Type II work.  It is also undisputed that the government contracting officer approved the award to AMI rather than PEPCO before Bettis actually awarded the Type II work.  In fact, the government contracting officer signed off on the proposed purchase order, which details the 2006 procurement process, the amendments, the varying proposals that were received, the attempted late modification by PEPCO, and Bettis's rationale for rejecting the PEPCO bid and accepting the AMI bid.  Ex. 28 at B00119-129.  PEPCO has not offered any evidence to suggest that the government was misled or made an uninformed decision.  The damages PEPCO alleges it suffered – the loss of profit from the failure to be awarded the Type II work and the cost of

building the new facility – arise directly out of the competitive bid process.  Because it is not in dispute that a government officer signed off on the decision to hold a procurement process and the decision to award the bid to AMI and not PEPCO, CUTPA's governmental immunity provision bars PEPCO's claims.

Alternatively, even if the governmental immunity provision did not bar PEPCO's CUTPA claim, summary judgment on this count is appropriate because PEPCO concedes that "Bettis did not: sell anything to PEPCO; rent or lease any property or services to PEPCO; or offer to sell, rent, or lease any property or services to PEPCO."  Bettis 56(a)(1) Statement, ¶ 85.  Therefore, none of the conduct that allegedly violated CUTPA can be fairly described as undertaken "in the conduct of any trade or commerce" under CUTPA's definition of those terms.[7]  PEPCO's arguments to the contrary are not persuasive.  Accordingly, count six fails as a matter of law.

G.   Count Seven: CUTSA Claim

PEPCO's trade secrets claim arises out of conduct relating to Bettis's alleged misappropriation of trade secrets in connection with the Type I work done pursuant to the 2003 subcontract and Type II work.  The parties agree that in order to prove a CUTSA claim, PEPCO would have to prove that it had a trade secret, which Bettis subsequently misappropriated.  Because the 2003 subcontract gave Bettis the unlimited right to use, distribute, or disclose that data, as discussed above, there can be no "misappropriation" of the Type I data, and therefore no trade secret claim.  With respect to the Type II work, PEPCO has already conceded that "PEPCO

---

[7]  CUTPA provides that: "'Trade' and 'commerce' means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."  Conn. Gen. Stat. § 42-110a(4).

provided its alleged Type II trade secrets to Bettis without any restriction on Bettis' use of that data," Bettis 56(a)(1) Statement ¶ 89 and PEPCO 56(a)(2) Statement ¶ 89, and, therefore, is precluded from arguing that it took the necessary steps to preserve the secrecy of that data as a matter of law.  Accordingly, count seven fails as a matter of law.

      H.     <u>Count Eight: Unjust Enrichment</u>

Bettis seeks summary judgment on PEPCO's unjust enrichment claim on the ground that PEPCO has not alleged, nor presented any evidence, that Bettis received any benefit by not paying PEPCO for budgetary guidance, knowledge, and engineering solutions for the Type II IDE.  Namely, Bettis contends that PEPCO has not claimed any benefit to Bettis arising out of PEPCO's provision of "budgetary guidance and the knowledge necessary to build the Type II product" or the provision of "engineering solutions to design and construction issues for the Type I and Type II product." Complaint, ¶¶ 81-82.  PEPCO responds that Bettis was enriched because it was able to accept a predatory low bid submitted by AMI.

Unjust enrichment is based on the principle that it is contrary to equity for a defendant to retain a benefit he has received at the expense of the plaintiff.  *Gagne v. Vaccaro*, 255 Conn. 390, 409 (2001).  "The doctrine's three basic requirements are that (1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment." *Id.*  The key issue on an unjust enrichment claim is: "Did [the defendant], to the detriment of someone else, obtain something of value to which [the defendant] was not entitled?" *Monarch Accounting Supplies, Inc. v. Prezioso*, 170 Conn. 659, 665 (1976).

PEPCO has not persuasively explained how Bettis's ability to accept a low bid during the 2006 procurement process was a benefit it received at the expense of PEPCO.  PEPCO has not

pointed to any evidence of data or information that it provided to Bettis for which it was not fully compensated.  PEPCO claims it is a disputed issue of fact "whether Bettis could have completed the 2006 procurement without the assistance of PEPCO's budgetary guidance, knowledge, and engineering solutions."  PEPCO 56(a)(2) Statement, ¶ 43.  There is no citation to the record for that statement.  Nor has PEPCO explained what this conclusory statement means.  PEPCO cannot rely solely on the allegations of its complaint to survive summary judgment.  Accordingly, count eight fails as a matter of law.

      I.    <u>Punitive Damages</u>

      Finally, in the absence of any surviving viable claim, PEPCO is not entitled to punitive damages.

## IV.    Conclusion

      For the foregoing reasons, Bettis's motion for summary judgment (**doc. #109**) is **GRANTED** and the motion to strike (**doc. #115**) is **GRANTED** in part and **DENIED as moot** in part.  The clerk is directed to enter judgment and close the file.

      It is so ordered.

      Dated at Bridgeport, Connecticut, this 26th day of March 2009.


              /s/ Stefan R. Underhill
                    Stefan R. Underhill
                    United States District Judge